IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

VICTOR ROBERT BROWN,

Plaintiff,

v.

OPINION AND ORDER

20-cv-180-wmc

JUSTIN RIBAULT,
LT. THEODORE ANDERSON,
DUSTIN ROWHER, LT. OLSEN,
JOSHUA BENDER, JESSE DICKRELL,
KAYLENE BETANCOURT,
DANIELLE ROBINSON,
EVAN BROYLES, APRIL COEY,
LUCINDA BUCHANAN, and
DR. JULIA PERSIKE,[1]

Defendants.

Plaintiff Victor Robert Brown, who is representing himself, was granted leave to proceed with claims that his Eighth Amendment rights had been violated by health care providers and prison officials at Columbia Correctional Institution ("CCI") who had allegedly failed to provide adequate treatment for his wounds and chronic pain, as well as ignored his threats of self-harm. (Dkt #50.) Before the court is defendants' motion for summary judgment (dkt. #140) and plaintiff's motion for assistance in recruiting counsel. For the reasons explained below, the court will grant in part and deny in part defendants' motion and reserve on plaintiff's motion.

[1] Originally, plaintiff was also granted leave to proceed against defendants Kyle Zenk, Ashlee Woods-Cirks, Daniel Norge, Kelsey Strange, and Shayne Lloyd on claims that they were deliberately indifferent to his threats of self-harm on December 18, 19, 25, and 30, 2019. (Dkt. #50.) However, these claims were dismissed previously for failure to exhaust administrative remedies (dkt. #133), and the court has updated the case caption accordingly.

## UNDISPUTED FACTS[2]

### A. Background

At all times relevant to this case, plaintiff Victor Robert Brown was incarcerated at CCI, where the defendants were employed by the Wisconsin Department of Corrections ("DOC") as correctional officers or health care providers. Specifically, Dr. Justin Ribault worked as a physician; April Coey worked as a nurse; Lucinda Buchanan worked as a Health Services Manager ("HSM") in the CCI Health Services Unit ("HSU"); Theodore Anderson and Olsen worked as lieutenants; Kaylene Betancourt and Dustin Rohwer worked as sergeants; Joshua Bender, Evan Broyles, Jesse Dickrell and Danielle Robinson worked as correctional officers ("COs"); and Julia Persike worked as a psychological associate.

Brown has a long history of committing self-harm, including by embedding objects into his arms. Brown has reported first starting "self-embedding," the act of inserting foreign objects either into one's own soft tissues under the skin or even into muscle, when he was 13 years old. Among other things, the pain involved in such self-harm is thought to provide a sense of psychological relief by the release of dopamine and its calming effect. In Brown's case, that pain stems from his self-inflicted wounds, including immediate and chronic pain from the wounds themselves, as well as sometimes even pain during wound care dressing changes. Brown also has a significant history of assaulting staff with bodily fluids for which he has been seen by psychiatric staff many times in the past.

[2] Unless otherwise indicated, the following facts are material and undisputed as drawn from defendants' reply to plaintiff's response to their proposed findings of fact. (Dkt. #162.)

**B. Brown's Prescription Treatment**

When writing prescriptions for inmates, DOC's Advanced Care Providers ("ACPs") utilize a "formulary" or list of prescription and nonprescription medications that are ordinarily available to authorized prescribers working for DOC and updated by each prison's pharmacy and therapeutics committee. An ACP may consider prescribing a non-formulary medication when alternative formulary medications have been proven to be ineffective or are contraindicated. When a drug is *not* listed on that formulary, however, the ACP must submit an advance request for "non-formulary drug approval" *before* prescribing it. Non-formulary requests are reviewed on a case-by-case basis by either the psychiatry director, the medical director, or an associate medical director.

Throughout his treatment of plaintiff Brown, Dr. Ribault regularly consulted with pharmacy to determine the best treatment options. For example, to treat Brown's more severe pain during wound care, Dr. Ribault prescribed the use of lidocaine (a numbing agent), Toradol (prescription NSAID), oxycodone and tramadol (opioids). For his chronic pain, Dr. Ribault also prescribed ibuprofen, Tylenol, duloxetine, a TENS unit, naproxen, Tegretol, and voltaren gel. However, Brown would not always use his prescribed drugs, reporting that they were ineffective. As an alternative, Brown would ask for gabapentin, reporting that it had previously helped with his pain.

Within the DOC's prison system, gabapentin is a non-formulary medication that is used to treat seizures, which is an FDA approved use, and sometimes to treat nerve pain, which is itself a non-FDA approved use. In particular, gabapentin is problematic in a correctional setting because it has the potential for abuse and diversion. To protect an inmate

and the rest of the inmate population from possible gabapentin abuse, as well as to protect patients from being extorted for their prescription, gabapentin is considered a "last resort" medication, which should only be prescribed when everything else has been tried and failed. Thus, the criteria for approving a request for an inmate's gabapentin prescription within DOC includes: (1) the failure of first-line treatments (Tylenol, NSAIDs, Amitriptyline and Duloxetine); (2) proven neuropathy by EMG; and (3) no history of medication diversion or misuse.

Brown has no history of receiving gabapentin within the DOC, but does have a history of medication diversion and misuse.

### C. Brown's Interactions with Medical and Non-Medical Staff at CCI

On January 16, 2020, Sergeant Rohwer observed Brown manipulating the trap on his cell door. Lieutenant Anderson then ordered Rohwer to conduct a search of Brown's cell. While directing Brown to get ready to be restrained for purposes of that search, however, another inmate stated that he had self-harmed. While Rohwer offered to treat that inmate to the level of his training, Brown spat on Rohwer twice. After being informed of Brown's actions, Lieutenant Anderson arrived on the scene with support. At this time, Rohwer continued his other duties in the day room area, but was otherwise removed from the situation with Brown.

The support staff assembled for a cell extraction, then observed Brown rolling up pieces of paper and attempting to insert them into wounds on his arm and under his skin. After some difficulty, including deployment of oleoresin capsicum ("OC") spray, extraction staff restrained Brown and took him to get medical treatment. Brown was then seen by nursing

staff for wounds on both arms, which he had stuffed with paper wads. While Brown was in a restraint chair, nurses removed the paper, applied pressure to stop the bleeding, and dressed his wounds. However, Brown refused further assessment and vitals.

Brown's wound care appointments the following two days, January 17 and 18, 2020, were conducted without incident. Moreover, at 7:15 a.m. on January 18, Brown was removed from ambulatory restraints and placed in clinical observation status with 15-minute observation checks, as recommended by Dr. Norge. Lieutenant Anderson returned to CCI for his regular night shift at 10:00 p.m. that evening, but was not involved in any incident with Brown during that shift or his previous shift on January 17. He also wrote no incident or conduct reports involving Brown for either of those shifts. Nor were there reports from other CCI staff indicating that Brown self-harmed on these nights.

On January 27, 2020, however, Brown avers that Lieutenant Olsen and he were having a conversation by his cell when he reported feeling "like self-harming, cutting, and inserting metal into his arm." (Dkt. #160, at ¶ 31.) In response, Olsen accused him of staff manipulation and walked away, after which Brown began to self-harm. (*Id.* at ¶ 32-34.) Later that day, Brown was seen by nursing staff for routine wound care to his left upper arm. (Dkt. #162, at ¶ 107.) During that appointment, nursing staff used wound cleaner and applied bacitracin, tefla dressing, and Tegaderm to the previous wound to Brown's left arm. Their notes from that day indicate no new self-harm wounds, active bleeding, nor other abnormalities. (*Id.* at ¶ 107-08.) Nor do staff notes reflect any issues during the next few days.

Then, on January 31, 2020, Brown was taken to the HSU for care after reporting that he placed metal into his arm. Fortunately, care providers were able to remove the 2-inch pencil piece from an old self-harm wound in his left arm after Brown voluntarily came out of his cell and went to the treatment room in the restrictive housing unit ("RHU"). After consulting with the onsite doctor, Brown's wound was then cleansed, packed, and dressed. Brown also reported that he had inserted "metal" into that same wound a week before. Because the nurse was unable to visualize it, an x-ray was scheduled to determine if any other foreign objects were present.

Finally, around 6:00 p.m. that night, Captain Boodry reached out to Dr. Persike, who was the on-call clinician for the Psychological Services Unit ("PSU"), to report that Brown had stuck another piece of pencil into his elbow, but that Brown also reported having no further plans or thoughts to commit any more acts of self-harm. Based on this report and her own experience with Brown, Dr. Persike concluded that Brown's status did not need to change, after which he was returned to his cell. Upon return, Brown nevertheless represents that he again engaged in self-harm using a piece of metal he had "found." (Dkt. #160, at ¶¶ 36-37.)

The following day, February 1, Brown was seen for his regular wound care appointment and again reported that he had inserted a piece of metal in his arm. However, the nurse was still unable to see it or palpate his wound due to significant scaring, and the clinical notes refer to no additional wounds or harm beyond Brown's existing wounds noted from the prior evening. (Dkt. #143-1, at 83-84.)

On February 7, 2020, at 11:30 a.m., Brown represents that he shared with CO Bender his feeling "like cutting" himself as "an avenue to cope with [his] anger" and "need[ed] to go to observation." (Dkt. #160, at ¶¶ 39-40.) In response, Officer Bender accused Brown of trying to manipulate staff. (*Id.* at ¶ 40.) After this interaction, Brown returned to harming himself, which Bender allegedly chose to ignore.

Later that same day, CO Dickrell and Sergeant Betancourt were passing out medications in Brown's housing unit. When Betancourt approached Brown's cell, he expressed his intent to self-harm and showed Betancourt a piece of metal. (Dkt. #160, at ¶ 45.) Betancourt allegedly responded by accusing Brown of trying to manipulate staff (*id.* at ¶ 45-47), after which he proceeded to engage in self-harm without interference from CO Dickrell or Sergeant Betancourt. For their part, defendants Bender, Dickrell and Betancourt do not recall Brown informing them of an intent to self-harm (dkt. #162, at ¶¶ 124, 129, and 136), although they all aver that *if* Brown *had* done so, they would have drafted an incident or conduct report. (*Id.* at ¶¶ 124, 130, and 152.) Further, Brown was not the subject of any conduct or incident reports from any CCI staff that day, nor does there appear to be any treatment by medical staff during this period. To the contrary, the contemporaneous HSU progress notes indicate that Brown had been refusing his scheduled care and that these refusals were documented. Contemporaneous staff notes also fail to indicate Brown had any new or open wounds at this time. Even so, Brown did submit a Health Services Request ("HSR") to the HSU on or about February 7, asking why staff had been refusing to care for his wounds. (Dkt. #143-1, at 83.)

On February 11, 2020, nursing staff saw Brown in the RHU, once more for reports of an open wound and for his reported insertion of metal into a wound area. While Brown allowed a nurse to remove some of the metal without issue, removal of a larger piece was referred to Dr. Ribault, who saw Brown the following day, February 12. At that time, Brown reported that he had inserted other foreign bodies near this same site, prompting Dr. Ribault to order an x-ray to determine if any other foreign bodies remained. Dr. Ribault next saw Brown on March 4 to discuss the removal of a remaining foreign body that the x-ray had confirmed *was* present in his left arm. Dr. Ribault then referred Brown for surgical removal of the foreign body by an outside facility.

On March 25, 2020, Brown was next seen by nursing after he again stuck a segregation pencil into an old wound. Brown avers that by this point he was upset, believing his wound care was not consistent enough. He was also upset with the delay in removing the foreign body from his arm. While Brown was then informed that he had an active referral for a surgical removal, no active appointment was scheduled due to the COVID-19 pandemic shutdowns. Convinced to take the pencil out himself, nursing staff then cleaned and covered Brown's new wound with a dressing. Because there were no signs of infection at that time, Dr. Ribault did not evaluate or address any of Brown's other complaints, but did see Brown the following day regarding infection concerns. While it remained unclear that Brown had any history of an infection, Dr. Ribault ordered antibiotics prophylactically given his history of self-harm.

On May 20, 2020, Dr. Ribault next noted that nursing staff reported Brown had a new wound after cutting himself with a piece of metal. Since Brown showed no signs of infections

or objective signs of pain, the plan at that time was to continue to offer wound care, then to assess Brown for any foreign bodies to be removed surgically should COVID-19 safety concerns allow.

Dr. Ribault next saw Brown on June 18, 2020. During this encounter, Brown reported that his wound was much better. When Dr. Ribault asked to examine the wound, however, Brown refused efforts to remove the bandage and stated that he was addressing it himself. At that time, Brown also had a pending physical therapy referral, which Dr. Ribault noted could help determine if non-formulary medications were appropriate. After Brown mentioned that gabapentin had previously helped with his arm pain, Dr. Ribault reminded him that he still had a pending orthopedic referral for surgical removal of any foreign body that had been inserted into his arm.

About two weeks later, on July 1, Brown avers that CO Robinson came to his cell in the RHU and: served him with "a bogus disciplinary action"; was told by Brown that he was going to "cut [himself] real bad"; was shown a sharp piece of plastic; responded "ok"; and walked away. (Dkt. #46 at 1-2.). After this incident, Brown was seen by Nurse Coey where he presented with a cut to an already existing scar on his left forearm and stated that he had stuffed three cotton balls full of feces into the wound. Dr. Ribault directed Nurse Coey to clean the wound with "Anasept wound cleanser," cover it with a bandage, and then continue monitoring the wound with daily assessments. Two days later, however, Brown developed a fever, prompting the nurse performing his wound care to contact the onsite doctor, who referred Brown to the local hospital for further treatment. However, after determining that

Brown's treatment at the hospital would require surgery (dkt. #143-1, at 140), he remained there until at least July 7. (*Id.* at 65.)

Dr. Ribault next saw Brown on July 10, 2020. After observing his wound at that time, Dr. Ribault noted no erythema, swelling, or purulence, concluding that wound care should continue. And after Brown again asked about gabapentin, Dr. Ribault explained that since his self-harm was the source of his pain *and* DOC policies in place could not ensure gabapentin would be used appropriately at this point, it would still not be prescribed for him. In fact, Brown not only failed to meet the DOC criteria for prescribing gabapentin because he had misuse concerns, but that formulary option had not yet been "trialed" by the institution.

Dr. Ribault again saw Brown on July 22, after he had reopened a wound on his right arm and had again been stuffing it with feces-filled tissue paper. Given that Brown required surgery the last time he engaged in this behavior, and spent at least four days at a hospital for treatment of an infection, and noting erythema along his forearm, Dr. Ribault referred him immediately to the hospital for further evaluation and treatment. After Brown returned from the hospital, Dr. Ribault also prescribed topical lidocaine to be applied to his wounds prior to medical care.

Some two months later, on September 13, 2020, CO Broyles informed Brown that he was going to be transferred to a different cell. In response, Brown avers that he informed Broyles of an intent to self-harm. After Broyles advised that his supervisors had been informed of his threat and would monitor him, Brown avers that he again began to self-harm. (Dkt. #160, at 50-51.) In contrast, Officer Broyles contends that Brown made no threat of self-harm until *after* he had informed Brown that he would be receiving a conduct report at a

later time. (Dkt. #162, at ¶ 159.) CO Broyles also avers that it was only after returning with another correctional officer to pass out medications that night, that he first informed Brown of his supervisors being made aware of his threats and were monitoring him. (*Id.* at ¶ 162.) At that time, Broyles also provided Brown with an ointment tube and covered his cell window for privacy while Brown applied the medication. Brown instead used the tube to harm himself. Approximately one minute later, when Brown passed the tube back and Broyles spotted droplets of blood, Broyles notified his supervisors of the presence of blood. After support staff arrived, Brown was restrained and taken to the RHU medical room for assessment and treatment.

That night, Brown presented with open wounds on both arms near the crook of the elbow and reported inserting gauze covered in feces into those lacerations, although he was not yet running a fever. Nevertheless, the nurse contacted Dr. Ribault, who ordered an intramuscular antibiotic to be delivered that same night to help prevent infection and further ordered that Brown be transported to the hospital in the morning. Ten days later, on September 23, Brown reported significant pain with his wound packing during dressing changes. In response, Dr. Ribault ordered liquid oxycodone. On September 29, 2020, HSM Buchanan also met with Brown to deliver compression gloves to help with pain in his arms; she further gave him 30mg of IM Toradol as pre-medication to help with pain during dressing changes. Dr. Ribault also met with Brown and told him that his wounds no longer required any packing, which should reduce his pain from dressing changes. Still reporting chronic pain, Brown again requested gabapentin, which was once again denied.

On October 5, 2020, Brown again inserted gauze into his wounds and was sent to the hospital for care. After seeing Brown on October 8, Dr. Ribault ordered tramadol for two weeks as a premedication for wound packing during dressing changes. Dr. Ribault also saw Brown on October 14 for concerns of infection, then returned him to the hospital for further treatment. On October 19, Brown again complained about pain during wound care and wanted an increase in his tramadol. After consulting with Brown's surgeon, Dr. Ribault increased the frequency of Brown's tramadol intake for the remainder of his prescription. Finally, on October 21, HSM Buchanan met with Brown, who reported that lidocaine gel was helping with his wound care.

After October 2020, Dr. Ribault was no longer Brown's treating physician;[3] however, Brown remained at CCI where HSU staff continued to provide regular treatment and care for his wounds.

## OPINION

In this suit under 42 U.S.C. § 1983, plaintiff claims that defendants violated his Eighth Amendment rights by being deliberately indifferent to his serious medical needs, contending in particular that: (1) Dr. Ribault and HSM Buchanan failed to provide effective medical relief for his arm wounds and chronic pain; (2) Sergeant Rowher did not seek immediate medical attention for him on January 16, 2020; and (3) Nurse Coey and Dr. Ribault refused to treat plaintiff on March 25, 2020. Plaintiff claims further that several of the security personnel defendants were deliberately indifferent to a serious risk of injury when they

[3] The record does not indicate why Dr. Ribault stopped being Brown's primary treatment provider.

ignored his sincere threats to self-harm on January 18, January 27, January 31, February 7, July 1, and September 13, 2020.

Defendants have moved for summary judgment on all of plaintiff's claims. Defendants argue that plaintiff's claims against medical staff fail because: (1) he does not have a constitutional right to demand specific medication; and (2) the care they provided was more than sufficient. Defendants argue further that plaintiff's claims against the security personnel fail because: (1) they were either not involved in the alleged incident; or (2) if they were, they responded reasonably to plaintiff's threats; or (3) plaintiff did not sustain a cognizable injury during certain of the alleged incidents. In the alternative, defendants argue that they are entitled to qualified immunity.

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that it is entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010). If that initial burden is met, then the nonmoving party must show that material, disputed issues of fact exist preventing the entry of summary judgment. *Id.*

Moreover, in doing so, "[t]he nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). "The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive a summary judgment motion; there

must be evidence on which the jury could reasonably find in favor of the nonmoving party." *Id*. (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087-88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

As Brown was previously advised at screening, while pro se litigants are entitled to liberal construction of their pleadings, they are not relieved of the burden to come forward in response to a motion for summary judgment with evidence that demonstrates a genuine issue of material fact. *Arnett v. Webster*, 658 F.3d 742, 760 (7th Cir. 2011) ("[A plaintiff's] pro se status doesn't alleviate his burden on summary judgment.") (citation omitted). Further, while the court views the record "in the light most favorable to the nonmovant and constru[es] all reasonable inferences from the evidence in his favor," *Moore v. Western Ill. Corr. Ctr.*, 89 F.4th 582, 590 (7th Cir. 2023), a nonmovant is only entitled to favorable inferences that are supported by admissible evidence, not those based upon mere "speculation or conjecture." *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted).

As an inmate, plaintiff's claims for failing to treat his medical needs adequately and for ignoring his threats of self-harm sound under the Eighth Amendment, which prohibits "cruel and unusual punishments" caused by deliberate indifference to conditions resulting in the "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Although the Constitution does not mandate comfortable prisons, officials have a duty under the Eighth Amendment to provide "humane conditions of confinement" by ensuring that

inmates receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Officials must further "take reasonable measures to guarantee the safety of the inmates" in their custody. *Id*. Plaintiff's claims concerning his medical care and his allegations that prison officials ignored his threats of self-harm are discussed separately below under this Eighth Amendment standard.

**I. Adequacy of Medical Care**

To succeed on a claim of constitutionally inadequate medical care, an inmate "must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc*., 839 F.3d 658, 662 (7th Cir. 2016)). A medical need is objectively serious if it "has been diagnosed by a physician as mandating treatment" or "is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Donald v. Wexford Health Sources*, Inc., 982 F.3d 451, 458 (7th Cir. 2020) (citations and internal quotations omitted). A prison official acts with the requisite deliberate indifference only if the official "*actually* knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (emphasis in original) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)); *see also Brown v. Osmundson*, 38 F.4th 545, 550 (7th Cir. 2022) (same).

In particular, the Seventh Circuit recognizes that proof of deliberate indifference is "a high bar 'because it requires a showing [of] something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022) (quoting *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012)). Thus, when a prisoner

has received treatment for his medical condition, courts will generally defer to a medical professional's judgment as to the adequacy of that care *unless* a plaintiff introduces evidence of defendant's departure from ordinary care by: "refus[ing] to take instructions from a specialist"; "fail[ing] to follow existing protocol"; "persist[ing] in a course of treatment known to be ineffective"; "choos[ing] easier and less efficacious treatment without exercising professional judgment"; or "inexplicably delay[ing] [] treatment which serves no penological interest." *Petties*, 836 F.3d at 729-31 (internal citations and quotations omitted).

**A. Dr. Ribault and HSM Buchanan**

To begin, plaintiff claims that from January through October of 2020, Dr. Ribault violated his Eighth Amendment rights by failing to provide effective relief for his arm wounds and pain. However, plaintiff has produced no evidence from which a reasoanble jury could infer that Dr. Ribault was deliberately indifferent. Indeed, the undisputed record shows that Ribault and those operating at his direction were constantly engaged in managing plaintiff's wounds and pain during the relevant time-period. Specifically, in 2020, plaintiff was seen by CCI nursing staff approximately 203 times, by Dr. Ribault no less than 12 times, and when necessary, Dr. Ribault repeatedly referred plaintiff to outside providers for more intensive evaluation and treatment, including hospitalization.

When making decisions to effectively manage plaintiff's pain and minimize any risk of addiction or abuse, Dr. Ribault also consulted with CCI's pharmacy and wound care specialists, as well as plaintiff's surgeon. Then drawing from his experience and consultation with these professionals, Dr. Ribault treated plaintiff's pain with ibuprofen, Tylenol, lidocaine gel, ketorolac, oxycodone, Toradol injections, tramadol, duloxetine, and naproxen, making

adjustments based on plaintiff's complaints. Additionally, plaintiff was provided a physical therapy referral, a TENS unit, and compression gloves and prescribed antibiotics to treat infections and probiotics prevent an upset stomach. Based on the number and frequency of visits, attention to his care, progressive nature of his treatment plan, and breadth of consultation supporting his decisions, no reasonable jury could find that Dr. Ribault disregarded a substantial risk of harm to plaintiff.

While plaintiff argues otherwise, disputing the adequacy of his care and particularly emphasizing that he should have been prescribed gabapentin because on previous occasions outside of the correctional setting it had been effective, plaintiff does not dispute that he failed to qualify for the use of gabapentin under the DOC guidelines. Moreover, the Seventh Circuit has routinely rejected a prisoner's claim "based on a preference for one medication over another unless there is evidence of a *substantial* departure from acceptable professional judgment." *Lockett v. Bonson*, 937 F.3d 1016, 1024 (7th Cir. 2019) (emphasis in original). Plaintiff has failed to produce evidence that Dr. Ribault's judgment was such a departure and has admitted that, while under Dr. Ribault's care, he received numerous other medications to help manage pain and prevent infections. Accordingly, Dr. Ribault is entitled to summary judgment as a matter of law on this claim.[4]

[4] Based on the record, the court is concerned that plaintiff was so often able to succeed with acts and attempts of self-harm, and which ultimately led to his more than 200 HSU visits in a single year, and that the DOC's plan to combat his self-harming tendencies did not seem to change much if at all during this time period. However, plaintiff has not argued or suggested that his treatment was improper based on a failure by the DOC or his medical providers to transfer or recommend his transfer to a facility better equipped to treat him. Plus, on its face, the DOC is better positioned to understand how to best allocate its resources to provide for those in its care, including those engaged in self-harm. Accordingly, the court will not address that issue any further.

As for defendant Buchanan, Brown alleges that she was indifferent to his arm wounds and pain for the same reasons as Dr. Ribault, but as the HSM, Buchanan was a nurse who could not order prescriptions *and* had to defer to treatment decisions made by Advance Medical Providers like Dr. Ribault. Regardless, Buchanan was entitled to rely on Ribault's treatment decisions. *See McCann v. Ogle Cnty., Ill.*, 909 F.3d 881, 887 (7th Cir. 2018) (affirming summary judgment for nurse who deferred to doctor's prescription that led to overdose). Accordingly, Buchanan is also entitled to summary judgment as a matter of law on this claim.

**B. Sergeant Rowher**

Plaintiff next claims that Sergeant Rowher also violated his Eighth Amendment rights because after plaintiff allegedly showed Rowher that he had self-harmed on January 16, 2020, Rohwer only offered a band-aid and did not seek immediate help from medical providers. This claim fails for at least two reasons.

First, there is no indication that Sergeant Rowher was actually aware of that plaintiff had suffered any self-inflicted injuries during the encounter, in which plaintiff spit on Rowher twice, necessitating additional staff. Specifically, the evidence shows that Rowher's observations were limited to: (1) observing plaintiff messing with the trap of his cell; (2) asking plaintiff to submit to restraints for a cell search; and (3) offering care to another inmate who had stated that he was actually self-harming. Without evidence of actual knowledge of plaintiff's injuries, Rowher cannot be held deliberately indifferent to them. *Farmer*, 511 U.S. at 837.

Second, even assuming Rowher had some knowledge of plaintiff's injuries, there is no reasonable inference that would support a finding of deliberate indifference. Indeed, after being spit on twice by plaintiff, Rowher was required by policy to remove himself from the situation. Even then, Rowher did not simply leave plaintiff alone. Rather, he waited until other members of prison staff took responsibility for plaintiff, who after being restrained, was taken to the HSU for treatment of his self-inflicted wounds. Based on these undisputed facts, no reasonable jury could conclude that Rowher was indifferent to plaintiff's wounds, nor that plaintiff suffered any cognizable injury based on Sergeant Rowher's actions. Accordingly, Rowher is entitled to summary judgment on plaintiff's claim.

### C. Nurse Coey and Dr. Ribault

Finally, plaintiff claims that defendants Nurse Coey and Dr. Ribault violated his Eighth Amendment rights when they refused to treat him after he painfully inserted a pencil into his arm and had difficulty removing it on March 25, 2020. This claim also fails.

First, it is undisputed that Nurse Coey was not involved in plaintiff's care *in any way* concerning the injury he reported on March 25. Without any personal involvement in the claimed violation, Coey cannot be held liable under § 1983. *See George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007) ("Only persons who cause or participate in the violations are responsible.").

Second, it is undisputed that: after sticking a pencil into an old wound, plaintiff agreed to remove it on his own; and a different nurse cleaned, covered, and stabilized plaintiff's wound without issue. Further, because there were no signs of infection at this time, it was not necessary for Dr. Ribault to address plaintiff's complaints that day. Finally, when Dr.

Ribault did see Brown the very next day for concerns of infection, Ribault prophylactically ordered antibiotics. Thus, plaintiff offers no evidence from which a reasonable jury could find that Dr. Ribault or anyone else refused to treat the wounds he reported on March 25, 2020.

In fairness, plaintiff contends that he continued to suffer from excruciating pain with a foreign metal object in his forearm. However, this does not create a genuine dispute of a material fact because he was told by nursing staff *on March 25*, that there was an active referral for the objects surgical removal, but could not be scheduled due to the COVID-19 pandemic. Moreover, as discussed above, Dr. Ribault and other HSU staff were actively attending to plaintiff's complaints, addressing his ongoing complaints of pain, and developing a treatment strategy to address it further. Accordingly, both Nurse Coey and Dr. Ribault are entitled to summary judgment as a matter of law on this claim as well.

## II. Deliberate Indifference to the Risk of Self-Harm

When an Eighth Amendment claim is premised upon a failure to prevent harm, a plaintiff must show that: he was "incarcerated under conditions posing a substantial risk of serious harm"; and defendants know of and were deliberately indifferent to that risk. *Sanville v. McCaughtry*, 266 F.3d 724, 733 (7th Cir. 2001) (citing *Farmer*, 511 U.S. at 834). In particular, a prison official can be held liable under the Eighth Amendment for self-inflicted harm committed by a prisoner if the official "subjectively knew" the prisoner was at "substantial risk" of self-harm or suicide, but intentionally disregarded that risk. *Collins v. Seeman*, 462 F.3d 757, 761 (7th Cir. 2006). To prevail on such a claim, however, the plaintiff must show that the defendant prison official "knew of a significant likelihood that the inmate would imminently attempt" self-harm or suicide, then "failed to take reasonable steps to

prevent it." *Davis-Clair v. Turck*, 714 F. App'x 605, 606 (7th Cir. 2018). Further, a "risk of future [self-harm] must be 'sure or very likely' to give rise to 'sufficiently imminent dangers' before an official can be liable for ignoring that risk." *Id*. (quoting *Baze v. Rees*, 553 U.S. 35, 50 (2008) (Roberts, C.J., plurality op.) (emphasis omitted); *Helling v. McKinney*, 509 U.S. 25, 33-34 (1993)).

As noted above, plaintiff claims that several of the security defendants failed to protect him from self-harm in violation of the Eighth Amendment by disregarding his threats of self-harm on January 18, January 27, January 31, February 7, July 1, and September 13, 2020. In contrast, defendants argue that most of plaintiff's claims fail because there is no evidence demonstrating that plaintiff suffered harm on the days claimed. Specifically, defendants have produced, and plaintiff does not dispute, HSU records from January 18 and 27, and February 1 and 7, that contain no mention of any new wounds and describe only routine cleaning and bandage replacement for previously inflicted wounds, including some notes from plaintiff corroborating the same. (Dkt. #143-1, at 83-86.) As a result, plaintiff's allegations about what he did or did not tell any of the correctional officers on those dates regarding his intentions to self-harm are rendered immaterial, due to the lack of an actual physical injury. *See Lord v. Beahm*, 952 F.3d 902, 905 (7th Cir. 2020) (the risk posed by officers ignoring a threat of suicide or self-harm "is not compensable without evidence of injury"). Indeed, the lack of actual injury indicates that any threat he did make was insincere and likely designed to either gain attention or to manipulate others. *Id*.

Absent evidence showing that plaintiff suffered any physical harm from self-inflicted injuries on those occasions, no reasonable jury could conclude that the accused defendants

were deliberately indifferent. *See Farmer,* 511 U.S. at 834 (under the objective element of an Eighth Amendment claim for deliberate indifference, "the deprivation alleged must be, objectively, 'sufficiently serious'") (quoting *Wilson v. Seiter,* 501 U.S. 294, 298 (1991)); *Sierra-Lopez v. Steingraeber*, No. 22-cv-502-wmc, 2025 WL 1744981, *7 (W.D. Wis. June 24, 2025) (granting summary judgment where "no evidence showed plaintiff actually suffered serious, physical harm, or even a substantial risk of his doing so by self-harm"). Accordingly, defendants are entitled to summary judgment as a matter of law on plaintiff's claims for failure to protect from self-harm on January 18, 27 and 31, as well as February 7, 2020. This leaves plaintiff's claims for self-inflicted injuries on July 1 and September 13, 2020.

**A. July 1**

Plaintiff claims that on July 1, 2020, CO Robinson was deliberately indifferent to his threat of self-harm. Specifically, plaintiff attested that CO Robinson came to plaintiff's cell in the RHU; served plaintiff with "a bogus disciplinary action"; heard plaintiff threaten to "cut [himself] real bad"; observed plaintiff holding a sharp piece of plastic; responded "ok"; and walked away.[5] After which, plaintiff "covered [his] window and savagely self-harm[ed] for over an hour." Additionally, plaintiff's HSU records indicate that he was seen that day by Nurse Coey because he *had* cut open an already existing scar on his left forearm and stuffed three cotton balls full of feces into the wound, which later required hospitalization and surgery.

[5] These facts are drawn from plaintiff's complaint. However, for summary judgment purposes the court infers that plaintiff would also attest to these same facts.

In their moving brief at summary judgment, defendants include CO Robinson's name in a heading listing a group of defendants, arguing generally that they are all entitled to summary judgment because they were not deliberately indifferent to plaintiff's threats as a matter of law. *See* dkt. #141, at 21. However, unlike CO Robinson's codefendants, no specific argument is raised or evidence introduced to demonstrate this entitlement. Indeed, outside of her general inclusion in this heading, CO Robinson's name does not appear *anywhere else* in defendants' summary judgment materials. (*See generally* dkt. ## 141, 161, and 162.)

In light on this omission, the undisputed facts appear to show that: CO Robinson knew plaintiff was at substantial risk of self-harming, based on his admission to her that he was going to "cut real bad" and his brandishing of a sharp piece of plastic; CO Robinson ignored this risk by walking away; and plaintiff spent an hour savagely cutting himself, suffering a serious, physical harm. Thus, defendants have failed to show undisputed facts entitle CO Robinson to judgment as a matter of law on this claim. *Carmichael*, 605 F.3d at 460 (7th Cir.2010). Accordingly, defendants' motion for summary judgment must be denied for plaintiff's claim that CO Robinson failed to protect him from self-harm on July 1, 2020. To the extent that the omission was inadvertent, defendant Robinson may have 30 days from the entry of this order to file a supplemental summary judgment motion to address this claim, if appropriate.

**B. September 13**

Finally, defendants argue that plaintiff cannot prevail on his claim that defendant CO Broyles failed to protect him from self-harm on September 13, 2020, because there is no

evidence from which a reasonable jury could find that he was deliberately indifferent to a substantial risk of plaintiff causing harm to his own health and safety. Plaintiff and CO Broyles offer different accounts of their interactions that day, but there are also some similarities. According to plaintiff, he told Broyles about his intent to self-harm around 4:30 p.m.; around 30 minutes later, Broyles advised plaintiff that his superiors had been informed of the situation and were monitoring him; plaintiff then began to self-harm; Broyles returned later for medication pass, giving plaintiff a metal tube of ointment; plaintiff apparently used that tube to further self-harm; and Broyles discovered that plaintiff had self-harmed and sought medical attention. According to Broyles, plaintiff did not make any threats of self-harm during their initial encounter at 4:30 p.m., and when Broyles returned to plaintiff's cell around 6:00 p.m., plaintiff threatened to self-harm. Broyles avers that he then reported this threat, after which security officers began to monitor the situation. When Broyles later passed a metal tube of ointment to plaintiff during medical rounds, plaintiff used the tube to self-harm and handed it back to Broyles. Finally, after noticing that plaintiff had apparently used the tube to self-harm as evidenced by blood spots, Broyles claims he immediately reported it and sought medical attention for plaintiff.

Under either version, two material facts are the same and undisputed: (1) when plaintiff informed Broyles of an intent to self-harm, he reported it to his supervisors to have them monitor the situation; and (2) when Broyles became aware of plaintiff's self-harm, he immediately intervened and sought treatment for plaintiff. Because Broyles took these proactive steps to prevent self-harm and address the wounds plaintiff suffered, no reasonable jury could conclude that Broyles was deliberately indifferent to plaintiff's injuries. *See Davis-*

*Clair*, 714 F. App'x at 607 ("An official who responds reasonably to a risk of harm is not deliberately indifferent to it even if the official fails to avert the harm.").

Even assuming that plaintiff's account of events is entirely accurate, as the court must at summary judgment, the mere mention of self-harm is *not* enough to put a reasonable officer on notice of a substantial risk of *imminent, serious* harm without a more concrete threat or at least a credible, specific threat of self-harm. *Collins v. Seeman*, 462 F.3d 757, 761 (7th Cir. 2006). Rather, an officer is entitled to exercise reasonable discretion in assessing such a risk. *Id*. Here, the record provides repeated examples of plaintiff's history of threatening self-harm for secondary gain *and* that Broyles was aware of this history. Indeed, in this lawsuit, plaintiff himself alleges six, separate instances in which he threatened self-harm, but only produced evidence of an actual injury in two. Based on this record, no reasonable jury could conclude that Broyles had knowledge of a substantial risk of imminent, serious harm by plaintiff. Accordingly, defendant Broyles is entitled to summary judgment as a matter of law on plaintiff's claim against him as well.

## III. Qualified immunity

Finally, defendants have asserted an alternative defense of qualified immunity, which protects government officials from liability for damages unless they "violate clearly established statutory or constitutional rights." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Once the defense is raised, a plaintiff bears the burden of defeating it by showing that: (1) the defendants violated a constitutional right; and (2) the constitutional right was clearly established at the time of the violation. *Garcia v. Posewitz*, 79 F.4th 874, 778 (7th Cir. 2023). "If either inquiry is answered in the negative, the defendant official is entitled to summary

judgment." *Pierner-Lytge v. Hobbs*, 60 F.4th 1039, 1044 (7th Cir. 2023) (citation and internal quotation marks omitted).

At a minimum, plaintiff has not shown that Dr. Ribault, HSM Buchanan, Gardner, Coey, Rohwer, Anderson, Olsen, Persike, Bender, Betancourt, Dickrell, and Broyles clearly violated his constitutional rights by deliberately ignoring an objectively serious threat of harm to his health and safety. Because these defendants are entitled to qualified immunity, the court will grant their motion for summary judgment for all defendants with the exception of CO Robinson because there is no briefing or evidence about her interaction with plaintiff on July 1.

## IV. Motion to Recruit Counsel

Plaintiff has also filed a third motion for recruitment of counsel, asserting the same mental health reasons noted in his previous motion: he has continued to seek counsel without success; and his release from prison has resulted in him losing access to case research and typing/printing materials. However, at this point, plaintiff has not shown that the legal and factual difficulties of this case exceed his abilities. *Pruitt v. Mote*, 503 F.3d 647, 654-55 (7th Cir. 2007) (en banc). Specifically, he has followed the court's instructions and responded to defendants' earlier motions. Despite asserting that his work is mostly copy and paste, his submissions have been responsive to defendants' arguments, and he has presented his own arguments in a clear and logical manner. Additionally, according to public records, plaintiff is back in DOC custody and is currently housed at Waupun Correctional Institution, giving him access to case research and other materials that he may need to pursue his case, which for the time being remains at the summary judgment stage. Accordingly, the court will reserve

judgment on plaintiff's motion for assistance in recruiting counsel following any resolution of defendant Robinson's supplemental motion for summary judgment.

ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment, dkt. #140, is GRANTED IN PART as to all claims against defendants Ribault, Buchanan, Gardner, Coey, Rohwer, Anderson, Olsen, Persike, Bender, Betancourt, Dickrell, and Broyles.

2) Defendants' motion for summary judgment, dkt. #140, is DENIED IN PART, subject to defendant Robinson having until October 5, 2026, to file a supplemental motion for summary judgment addressing plaintiff's specific claim against her.

3) Judgment on plaintiff's motion for assistance in recruiting counsel, dkt. #163, is RESERVED following any resolution of defendant Robinson's supplemental motion for summary judgment.

Entered this 3rd day of September, 2026.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge